## Case No. 7,293.

### The JERUSALEM.

[2 Gall. 191.] [1]

Circuit Court, D. Massachusetts. Oct. Term, 1814.

---

[1] [Reported by John Gallison, Esq.]

Mr. Hubbard, for libellant.

Mr. Blake, Dist. Atty., for claimants.

Mr. Prescott, in reply.

STORY, Circuit Justice. It is not necessary, in this stage of the cause, to inquire into the exactness or regularity of the allegations of the parties. A preliminary question, as to the right of this court to adjudicate upon the merits of the case, has been brought forward upon a protest to its jurisdiction, and after an ample discussion, remains now to be decided.

The question in short is this, whether the courts of the United States, in the exercise of their authority over causes of admiralty and maritime jurisdiction, have cognizance of maritime suits in rem between foreigners, whose permanent domicil is in a foreign country, when the specific property is within our territory. I state this as the general question, although in the acts of court the parties have alleged facts, which, if proved, might perhaps somewhat narrow the discussion. But it is fit, that the general principle, that governs this class of cases, should be extracted from the embarrassment of minute circumstances, examined in its more extended application. Whatever may be the case as to other maritime contracts, respecting which I affirm or deny nothing, it cannot be doubted, that the contract of bottomry is one, over which the admiralty exercises an undisputed jurisdiction. It is indeed, the only tribunal capable of enforcing a specific performance in rem by seizing into its custody the very subject of hypothecation. To its guardian care, I may without rashness affirm, the whole commercial world look for security and redress, and without its summary interference, maritime loans would, in all probability, become obsolete. A jurisdiction so ancient and beneficial, which exercises its powers according to the law of nations, and those rules and maxims of civil right, which may be said to form the basis of the institutions of all Europe, ought not to be restrained within narrow bounds, unless authority or public policy distinctly requires it.

It is argued, that the courts of a country cannot consistently with the law of nations, take cognizance of any controversy between foreigners, who are not domiciled within its territory; and Vattel (book 2, c. 7, §§ 84, 85; book 2, c. 8, § 103) is cited in support of the position. It is true, that Vattel contends that personal controversies between foreigners, or between a foreigner and a citizen, are to be determined by the judge of the place, where the defendant has his settled abode, or where he is, when any sudden difficulty arises. But this rule is so far from being universally acknowledged, that many nations exercise jurisdiction over the property and persons of foreigners found transiently in their territory, not only in favor of citizens, but also of other foreigners. Vinn. Comm. Inst. de Actionibus, lib. 4, tit. 6, p. 777, §§ 8, 9; 2 Hub. lib. 5, tit. 1, § 46; De Carriere v. De Calonne, 4 Ves. 577. The rule seems indeed exclusively drawn from the civil law. But, however the case may be, as to remitting the defendant to his domestic forum in personal controversies, it is very clearly settled, that in proceedings in rem, or the real actions of the civil law, the proper forum is the locus rei sitae. Indeed, it seems to have been a question among civilians, whether the action in rem could be brought before any other tribunal. 8 Vinn. Comm. Inst. de Actionibus, lib. 4, tit. 6, p. 777; 2 Hub. lib. 5, tit. 1, p. 728, § 50; Heinec. Ad. Pandect, lib. 5, tit. 1, § 36; Bynk. De Foro Leg. c. 4; Casar. Disc. 43, § 53; Id. Disc.

179, § 52; 2 Emer. Des Contrats a la Grosse, c. 9, § 2; Id. p. 528, § 4.

With reference, therefore, to what may be deemed the public law of Europe. a proceeding in rem may well be maintained in our courts, where the property of a foreigner is within our jurisdiction. Nor am I able to perceive how the exercise of such judicial authority clashes with any principles of public policy. The refusal might indeed well be deemed a disregard of national comity, inasmuch as it would be withholding from a party the only effectual means of obtaining his right. And, accordingly, it has been held, that it is a good cause of reprisal for a sovereign not to compel his courts to execute the sentence of a foreign court, where the person or goods sentenced are within his jurisdiction. 2 Brown, Adm. 120. It is argued, that the exercise of such authority would be highly inconvenient, inasmuch as this contract, like many other maritime contracts, is differently regulated in different countries, and therefore the construction of the contract, as well as the remedy on it, might in many cases essentially differ. And it is urged, that on this ground courts of law uniformly refuse to interfere. in respect to the contracts of foreigners made with their own seamen for marine services. I am not aware, that the inconvenience is so great as has been represented. It is a general rule, that foreign contracts are to be construed according to the law of the place where they are made, or to be executed. And I do not perceive the hardship of compelling a party to perform his engagements according to the construction, which the courts of his own country would put upon them. In respect to maritime contracts. there is still less reason to decline the jurisdiction, for in almost all civilized countries. these are in general substantially governed by the same rules. Almost all Europe have derived their maritime codes from the Mediterranean; and even in this country we take a pride in conforming our decisions to the rules of the venerable Consolato del Mare.

As to the case alluded to, of the contracts of seamen for wages. I am not aware that any authority countenances the position. to the extent in which it is laid down. Where the voyage has not terminated, or the seamen have bound themselves to abide by the decisions of the tribunals of their own country, foreign courts have declined any interference. and remitted the parties to their own tribunals for redress. But where the contract has been dissolved by the regular termination of the voyage. or by the wrongful act of the other party, the cases are not unfrequent, in which foreign courts have sustained the claim for mariners' wages. Limland v. Stephens, 3 Esp. 269; Hulle v. Heightman. 4 Esp. 75. 2 East. 145; Sigard v. Roberts. 3 Esp. 71: Thompson v. The Catharina [Case No. 13,949]; Willend-son v. The Forsoket [Id. 17,682]; Moran v. Baudin [Id. 9,785]; Weiberg v. The St. Oloff [Id. 17,357]; Thomson v. The Nanny [Id. 13,984]. And although the doctrine in Gienar v. Meyer, 2 H. Bl. 603, and the intimations in The Two Friends, 1 C. Rob. Adm, 271, look the other way, it does not seem to me that they outweigh the authorities on the other side. even supposing (which is not admitted) that they are not to be reconciled.

It is admitted, that suits for salvage have been entertained between foreigners in the admiralty, and it is urged that these form exceptions to the general rule, as cases standing upon the jus gentium, or upheld by the consent of the parties. Independent, however, of the principle, that consent can never give a jurisdiction to a court, which it cannot otherwise sustain, the decisions on this subject evidently proceed upon the ground, that the court has a competent capacity, and leave the policy of its exercise to be judged of by the circumstances of the particular case. The Two Friends, 1 C. Rob. Adm. 271; Mason v. The Blaireau, 2 Cranch [6 U. S.] 240. And although Sir W. Scott intimated, in The Two Friends. that if there was the slightest disinclination of the parties to submit to the jurisdiction. he should not incline to interfere; yet he evidently refers to cases, where all the foreign parties decline the jurisdiction (as might happen in cases like that before him). and not to cases, where the jurisdiction was sought by one of them. And the whole current of his reasoning strongly leans in favor of the policy of sustaining the general jurisdiction of the admiralty over foreigners. In the same case, it was asserted by counsel, and not denied. that the admiralty frequently entertained bottomry suits between foreigners. And, accordingly, we find that in The Gratitudine. 3 C. Rob. Adm. 240, and The Jacob. 4 C. Rob. Adm. 245, both of which cases were contested on other points with great ability, the court sustained the jurisdiction and decreed in favor of the bottomry holders. It may be said that the question of jurisdiction passed without objection; but it is difficult to conceive, that it could have escaped the attention of the court and of the bar, if it had been deemed tenable. It has been argued, that these were cases where the voyage ended within the British dominions, and therefore are distinguishable. But I know of no principle, which sustains this distinction. It was not the case of a contract made with reference to the laws, and to be executed within the dominions, of Great Britain. The most that can be said is, that there the lien first attached absolutely upon the property. In the latter case, however. this lien grew out of a former voyage. and was applied to reach proceeds of freight. which accrued in a subsequent voyage. The ground then of the jurisdiction could not have been, that the voyage terminated in Great Britain. but that

the proceeds were within the reach of the court.

And this leads me to the consideration, that the jurisdiction of the admiralty, in matters of contract, depends not on the character of the parties, but on the character of the contract, whether maritime or not. When once its jurisdiction, therefore, rightfully attaches on the subject matter, it will exercise it conformably with the law of nations, or the lex loci contractus, as the case may require. It will enforce a foreign maritime judgment between foreigners, where either the property or the person is within its jurisdiction. 2 Brown, Adm. 120. Yet the objection to such proceedings, so far as touches the remedy, applies as forcibly here as in other maritime causes.

It has been urged, that whatever may be the propriety of interfering· in cases arising between the subjects of the powers of Europe, the court ought studiously to abstain where the parties are subjects of the Sublime Ottoman Porte. It is certainly true, that in prize causes an indulgence is granted to the subjects of the Ottoman empire, which is not allowed to any foreigners of Christian Europe, in consideration of the peculiarities of their situation and character, and of their not being professors of exactly the same law of nations with ourselves. · The Madonna del Burso, 4 C. Rob. Adm. 169. But in matters of contract between such persons, or between them and other foreigners, I am not aware that courts have thought themselves at liberty to act otherwise, than by the general rules applicable to all forensic business; especially where one subject of the empire has asked for redress against another, and upon a maritime contract, the stipulations of which seem to require a summary interference, and to recognize an acquaintance with the general maritime codes of Europe.

On the whole, I am of opinion, that the rule of the civil law, "in actionibus in rem speciale forum tribuit locus in quo res sitae sunt" (Vinn. Comm. Inst. de Actionibus, lib. 4 tit. 6, p. 777; Heinec. Comm. in Pand. pt. 2, p. 147, § 36), applies to this case; that there is no solid ground against the exercise of the jurisdiction, and in the language of Sir W. Scott, on another occasion (The Two Friends, 1 C. Rob. Adm. 271, 280), I will add: "I go farther, and say, that I think there is great reason for it, because it is the only way of enforcing the best security, that of the lien on the property itself."

I have thus far considered the case upon general principles; and if I had felt any difficulty in the conclusion, which I have already stated, I should have felt none, when the contract itself carries on its face a stipulation, that the voyage was to terminate in a foreign country; and therefore that a suit in rem in such a foreign country would not only be sustained (as the claimant's counsel has admitted) but was evidently within the contemplation of the parties. Where the parties have, therefore, waived the benefit of the exclusive jurisdiction of their own tribunals, the whole reasoning, upon which they should be remitted to such forum, falls to the ground. To remit this cause from the present to another foreign forum, I imagine would be "but to change postures on an uneasy bed."

There is also another fact alleged, and which, if true, brings this case directly within the authorities cited, and that is, that the voyage really ended in the United States. The voyage stated in the bottomry bond is from Smyrna to the West; and a different rate of interest is payable, as the cargo shall be discharged in Malta, or Sicily, Majorca, Minorca or other port in Spain or in Lisbon. And the claimant expressly stipulates to make payment in Smyrna, on his safe return, or in any other places where the obligation should be presented to him, after the sale of the cargo then on board. And the allegation of the proponent states, that the cargo was wholly sold, part in the United States, and part at the Havanna. But I forbear to dwell on this and other peculiarities, because I am entirely satisfied to rest the cause on the soundness of the general doctrine. I overrule the protest of the claimant to the jurisdiction of the court, and assign him to answer peremptorily to the libel of the plaintiff.[3]

Prescott & Hubbard, for libellant.
G. Blake, for claimant.

At a subsequent day of the term Blake read the answer in chief of Catara, which, among other things, denied that the instrument of hypothecation relied upon was his deed. The replication averred the bond to be the deed of Catara. A copy of the contract in the handwriting of the Swedish consul at Smyrna, and attested by him as a true copy, was produced by the counsel of the libellant, and upon this they founded a motion for a continuance, to afford them time for procuring the original.

Mr. Blake, Dist. Atty., opposed this motion. He represented to the court the extreme hardship of this case, and contended, that there had been such remissness and laches in not procuring the original, that no postponement ought to be granted to the libellants for this cause; that three originals were executed, and probably delivered to the obligee; that one of these might have been sent at the same time with the copy; that it would be impossible to obtain the original from Smyrna in any reasonable time, and that the libellant had therefore commenced this action prematurely, and ought not be permitted to hold the claimant in fetters for so long a time, as must necsarily elapse.

STORY, Circuit Justice, said, he did not wish to hear the other side; that the principles of law were clear; that admitting three

---

[3] See the case of The See Reuter, 1 Dod. 22.

originals to have been executed, it would have been difficult, considering the nature of this voyage, for the libellant to obtain such intelligence, as would enable him to determine, to what place the originals should be sent; that the hardship was common to both parties; and that the court could not be influenced by the distressed situation of Catara, however it might be deserving of pity; that, at common law, it was the practice to allow time for procuring originals, as in cases of bills of exchange; that there did not appear, in this case, to have been any laches on the part of the libellant, and there being evidence to satisfy the court of the existence of an original, the cause must therefore be continued. If, as was alleged, the vessel was in a perishing condition, an order of sale might be made, upon a proper application for this purpose.