December 6, 1861.

## SUPREME COURT—IN ADMIRALTY.

### JANUARY TERM, 1862.

FRANKLIN A. WARREN *et als. vs.* BARK " BENJAMIN RUSH."

PROTEST of American Consul and Commissioner of the United States, against the jurisdiction of the Courts of this Kingdom, sitting as Courts of Admiralty in a case like the present, overruled.

Held, that the exercise of jurisdiction is discretionary in entertaining suits between foreigners, but in a case of special necessity to prevent a failure of justice, the duty is imposed to exercise the jurisdiction.

Distinction drawn (as to the necessity of exercising jurisdiction) between engagements entered into and to be terminated within this Kingdom, and those made at a foreign port for a cruise to end at the same port.

The provisions of the 21st article of the French treaty do not lessen the jurisdiction of the Courts in adjudicating upon contracts for mariners' wages, according to the general principles of the maritime law affecting such contracts.

Although the jurisdiction of crimes and misdemeanors has been yielded, to a certain extent, by the treaty with France ; still, the case of mariners' wages, arising from a contract terminating here, does not come within what is meant

Franklin A. Warren *et als. v.* Bark Benjamin Rush.

by matters of difference touching the internal order of the vessel as expressed in the treaty, and would not, therefore, in such a case, limit the jurisdiction of the Court.

A demand, on the part of the libellants, for a settlement and payment regarded as indispensable before suit brought.

When the parties agree to settle at the Consulate, and the master or agent of the ship deposits there the money due the seamen, presenting a true account of the catchings of the vessel, he has complied with his duty.

The question of the commission, charged by the Consul for such settlement at his office, and deducted by him from the amount to be paid the seaman, is a matter between the seaman or his agent and the Consul.

Judgment of the Court below, so far as it relates to the question of jurisdiction, confirmed ; but reversed wherein the claims of the libellants are sustained—ROBERTSON, J., dissenting from the latter portion of the judgment of the full Court.

ALLEN, C. J.

This is a suit *ad rem* against the ship "Benjamin Rush," for seamen's wages for services performed on board said vessel on a cruise whaling.

It was originally instituted in favor of F. A. Warren, William S. Beckwith and George Edwards, and, by the decision of the Court below, the libel was dismissed as to said Warren, but sustained as to Beckwith and Edwards. From this decision the claimants appealed.

The allegations in the libel of the contract of shipment and the service performed, and of the quantity of oil and bone taken, are admitted by the claimants, but they deny that the appellants ever made a demand for their wages upon Captain Fish, or upon any other party having authority in the matter. They further aver that it is the custom to pay all foreign seamen, from American whaleships, at the American Consulate, which they offered to do ; and, further, that the libellants have not procured their lawful discharge from the vessel, and therefore have no right to appear in Court and sue for their wages.

The Consul of the United States filed a protest against the jurisdiction of the Court in this case :

1st. On the ground that by the 21st Article of the French Treaty the Consul of the United States has the exclusive jurisdiction of the matter and things complained of in said libel.

2d. That by the comity of nations the jurisdiction ought not to be entertained.

The counsel for the respondents presented the following in the name and on the behalf of the Commissioner of the United States, on the trial of the appeal before the full Court, viz :

1st.   The Government of the United States deny the right of jurisdiction of the Hawaiian Courts, in all matters of difference between American citizens, upon, or attached to, American ships, in all maritime matters, without the consent of the parties interested ; or against the protest of American officers, accredited to this Government.

2d.   The Government of the United States insists upon its own interpretation of its own laws, treaties, and Constitution, in all matters relating to official duties, and official responsibilities, or in the internal order, discipline and administration upon American merchant ships, in all matters whatsoever, and particularly when the revenue of the country is involved.

While we do not regard it in accordance with usage for foreign officers invested with diplomatic powers, and in a diplomatic capacity, to impose their objections to the progress of a case in Court, in the nature of a protest, yet we will waive this objection, and give his points the respectful consideration which their legal force and the eminent source from which they emanate render proper.

It may be well to review the principles of the maritime law as recognized by the judicial authority of other nations, and especially by the nation under whose flag this vessel sails, and then to examine the 21st Article of the French treaty, to see how far these principles have been limited in their application to this Kingdom.

For a brief review of the authorities on maritime jurisdiction, I will refer to the decision of this Court in the case of Enos *vs.* Sowle, Hawaiian Reports, Vol. 2, p. 332.

" It seems to be well settled, after some controversy, says Parsons, who is an eminent American jurist, that an Admiralty Court has full jurisdiction over suits between foreigners, if the subject matter of the controversy is of a maritime nature.   It is, however, a question of discretion in any case, and the Court will not take cognizance of the cause, if justice would be as well done by remitting the parties to their home forum."   He further says that " it is in cases of seamen's wages that the

Franklin A. Warren *et als. v.* Bark Benjamin Rush.

power of the Court is most frequently invoked, and it is well settled that cognizance of a suit will be taken when justice demands that it should be done, as when the voyage is broken up at a port of this country, or the seaman is compelled to desert on account of cruel treatment, or is entitled to be discharged on account of deviation." I will advert to some of the authorities referred to by the learned author, as well as to some others. (Parson's Maritime Law, 2 vol., 54 sec.)

In the case of Taylor *vs.* Carryl, 20 Howard's Rep., 611, the learned Chief Justice of the Supreme Court of the United States says : It is true that it is not in every case obligatory upon our Courts of Admiralty to enforce it (a lien) in the case of foreign ships, and the right or duty of doing so is sometimes regulated with particular nations by treaty. But as a general rule, where there is no treaty regulation, and no law of Congress to the contrary, the Admiralty Courts have always enforced the lien where it was given by the law of the state or nation to which the vessel belonged. In this respect the Admiralty Courts act as International Courts, and enforce the lien upon principles of comity. There may be, and sometimes have been, cases in which the Court, under special circumstances, has refused to interfere between the foreign seaman and ship-owner ; but that is always a question of sound judicial discretion, and does not affect the jurisdiction of the Court." In Ellison *vs.* ship " Bellona," Bee 112, the Court say that " Courts of Admiralty have a general jurisdiction in causes, civil and maritime. The case of seamen's wages comes within this description of causes ; and this jurisdiction has been uniformly exercised by me, as regards foreigners generally." In Pugh *vs.* Gillan, 1 Calif., 485, where the plaintiff was a British subject, shipped on time, and was discharged by the master some days before the time expired, because the vessel was about to sail on a long voyage, it was held that he could sue in our Courts, though the vessel and captain were English. In the case of Davis *vs.* Leslie, Abbott's Ad. Rep., 131, the Court say : " That the foreign libellant is regarded as not entitled to invoke the power of the Court as matter of absolute right ; yet where the Court is satisfied that justice requires its interposition in his favor, those powers may be, and will be, exercised in his behalf." The authorities, both English

and American, fully sustain the doctrine of the power of the Admiralty Courts to entertain suits between foreigners; while, at the same time, its exercise is discretionary. If it is a case of special necessity to prevent a failure of justice, the duty is imposed to exercise the jurisdiction. (The " Courtenay," Edw. Admiralty Rep., 239 ; the " Wilheim Frederick," 1 Hagg. Adm. Rep., 138 ; Willendson *vs.* The " Torsomet," 1 Peter's Adm. Rep., 196 ; in the " Jerusalem," 2 Gall. Rep., 191 ; the " Aurora," 1 Wheaton Rep., 96.) In the case of Johnson *vs.* Doltan, 1 Cowen, 543, which was an action by a seaman against a master, both foreigners, for assault and battery committed on shipboard, the Supreme Court of the State of New York sustained the jurisdiction. They say : " Our Courts may take cognizance of torts committed on the high seas on board a foreign vessel ; but on principles of comity, as well as to prevent the frequent and serious injuries that would result, they have exercised a sound discretion in entertaining jurisdiction or not, according to circumstances."

In the case of Davis *vs.* Leslie, Abbott's Ad. Rep., 134, Judge Betts says " that it seems to be the settled understanding and course of Courts of Admiralty, as already intimated, not to permit their jurisdiction to be invoked as matter of right to sustain suits brought by foreign seamen against masters or owners, being also foreigners, or against foreign vessels. In England, indeed, the assent of the representative of the Government to which the seaman belongs is required before the Courts will proceed to entertain jurisdiction. (The " Wilheim Frederick," 1 Hagg. Ad. Rep., 138.) But in the Courts of the United States this precautionary condition is not required ; and jurisdiction will ordinarily be exercised, if the voyage has been terminated by full completion or abandonment, or if the contract of hiring is dissolved by the wrongful act of the owner or master."

In the case of the " Bee," Ware's Rep., 337, which was for salvage service, a motion was made by respondent to dismiss the bill, because the parties in the cause, both libellants and respondents, are foreigners, and subjects of the King of Great Britain, and because the vessel is not only a British vessel, but was taken by the salvors, after the disaster had happened, from British waters, and brought within the jurisdiction of the Court.

Judge Ware overruled the motion, and, in giving his opinion, said : "The Courts of this country are not bound to take jurisdiction of controversies between foreigners having no domicile in this country, as they are when parties are citizens or residents among us, and are thus entitled to claim of right the benefit of our laws. The question is not one affecting the competency of the Court, but it turns upon the expediency of taking jurisdiction in this particular case." In the case of the bark "Havanna," it appeared the ship was owned by a British subject, living in St. Johns, New Brunswick, and a creditor of his, who was also a British subject and residing in the same place, instituted a suit against him in the Courts of Massachusetts, and attached the vessel, then lying in the port of Boston, and afterwards recovered judgment and took out an execution, by virtue of which the vessel was sold, and purchased by the execution creditor ; whereupon the master libelled the vessel for his wages, by virtue of the statute of 17 and 18 Victoria, which gives a lien to a master on his ship for his wages ; and Judge Sprague, eminent and of long experience in Admiralty, ruled "that the District Court may, but is not bound to, exercise jurisdiction in favor of a British subject against a British vessel, and that the lien so given may be enforced in the Admiralty Courts of the United States." (22 Vol. Law Rep., 150.) The ship was arrested and sold on the application of a British creditor, who had no security on the ship, for the payment of a debt existing by British law, and another British subject having a lien, which gave a paramount right under the British law, appeals to the Court for a remedy. Judge Sprague says : "That to refuse his application would be to sustain by our tribunals the inferior and subordinate claim of one British subject, and to refuse the higher and paramount claim of another. It would be not only doing injustice to the libellant, but a friendly nation might well complain of such a perversion of her law by a partial administration of it."

Supposing, for example, the owners of the "Benjamin Rush" had made sale of her, or her master had succeeded in getting his clearance and ship's papers by misrepresentation, and was in the act of sailing without paying the crew, whose contracts terminated here, it will not be denied that their claim is of a

Franklin A. Warren *et als. v.* Bark Benjamin Rush.

maritime nature, and will it be contended that the Court of
Admiralty has not jurisdiction to enforce such a claim ?    There
is a practical difference in the necessity of taking jurisdiction
to prevent a failure of justice in the engagements at the home
port for the voyage, and of those made at a foreign port for
a cruise to terminate at the same port.    If the lien is lost at,
the foreign port, it is probably lost for ever, for it is not within
the range of probabilities that the seaman will have another
opportunity to enforce it, as Sir William Scott says, in the case
of the "Two Friends," 1 Rob. Rep., 271, 280 : "It is the only
way of enforcing the best security, that of a lien on the pro-
perty itself."    In the case of the "Jerusalem," 2 Gall. Rep.,
198, Judge Story says : "That when the contract has been dis-
solved by the regular termination of the voyage, or by the
wrongful act of the other party, the cases are not unfrequent
in which foreign. Courts have sustained the claim for mariners'
wages.    The "Catherina," 1 Peter's Rep., 104; the "Torsomet,"
1 Peter's Rep., 197 ; Moran *vs.* Banden, 1 Peter's Rep., 415,
Mr. Justice Curtiss, of the Supreme Court of the United States,
overruled a protest of an English Consul to the jurisdiction of
the Court, in a case where the libellant, an American citizen,
had been hired in Boston for a voyage in an English registered
vessel, with an English master, from Boston to St. Jago and
back to a port in the United States.    The voyage was perform-
ed and the men discharged in Boston.    An action was com-
menced in a cause of personal damage, and the English Consul
filed a protest to the jurisdiction, setting forth that the vessel
was a British vessel and the commander a British subject ; also,
"that an investigation of some of the alleged causes of damage
must call in question official acts and conduct of a British func-
tionary in regard to British subjects, for which he is responsible
only to his Government."    Mr. Justice Curtiss, in giving his
opinion, said : "It is true this Court should not call in question
a British Consul, for his official acts respecting the crew of a
British vessel in a foreign port.    It is correctly stated in the
protest, that he is responsible solely to his own Government ;
or if to individuals, such responsibility grows out of the muni-
cipal laws of his country, which this Court would not undertake
to administer.    But it does not follow that the conduct of the

master of such a vessel, in procuring the official intervention of the Consul, upon false allegations, to the injury of an American citizen by imprisonment in a foreign jail, is not to be here investigated. That depends on other considerations, and is not distinguishable from any other wrong done by the master, of which this Court should take or refuse jurisdiction according to the national character and domicile of the parties, and the place of termination of the voyage." The "Courtenay," Edw., 239 ; the "Calypso," 2 Hagg., 209 ; the "Salacia," 2 Hagg., 262; the "Madonna," 1 Dodson, 37 ; the "Two Friends," 1 Rob., 271 ; the "Johann Friederich," 1 Wm. Rob., 38 ; the "Bee," Ware's Rep., 332 ; the "Jerusalem," 2 Gal. R., 191.

The Court fails to see the force or application of the second point in the Honorable Commissioner's protest. The Court does not call in question the official duties, or the official responsibilities, of any of the United States officers, and if the doctrine is sound, which we do not controvert, that the United States can properly insist on its interpretation of its own laws, treaties and constitutions, this Kingdom will undoubtedly insist on the same doctrine as applicable to its laws, treaties and constitutions. Under this exposition of powers, the construction of the 21st Article of the treaty with France, as made by this Court, settles the question, that the case of a mariner's wages, arising from a voyage which terminates at this port, is within its jurisdiction, inasmuch as by our construction of the treaty, it does not vary the maritime law, or lessen the jurisdiction of our Courts upon the contracts for mariners' wages.

It is contended further, that the revenue of the country is involved in securing the fees, and a portion of extra wages arising from the discharge of a seaman; and, therefore, this Court should not exercise jurisdiction. No statute of the United States has been adduced making a discharge a condition precedent to a settlement for mariner's wages. So far as this argument applies, it is the same whether the settlement is made at the Consulate, at the counting-room of the owner by mutual agreement, or the claim enforced by an adjudication of this Court. The Consul, as I understand from the record, does not regard it his official duty to make the calculations and settle the accounts, but only to settle the disputes between master and

seaman, if any exist.   They are at liberty to settle where they
please, and on the terms satisfactory to themselves.   The dis-
charge is a matter for the seaman to attend to.   He requires it
as a matter of protection to himself, to enable him to receive
the two months extra wages in cases allowed by the laws of the
United States, and to procure a permit to remain in the King-
dom for sixty days.   But it is argued that the discharge should
not be given till after a settlement, as this would be used as an
incentive to procure it, and thereby enable the master to ac-
count for his men.   If the seaman neglects, after settlement, to
procure his discharge, the master can protect himself by a cer-
tificate that he has left the vessel, and on the score of revenue,
the fee for this service, we believe, is as much as for a discharge,
so the revenue will not suffer, neither will the master, for he
pays the fee in either case.

Reference has been made to our laws on the subject, but they
only interdict the discharge, unless the seaman has procured
from the Harbor Master a permit to remain in the Kingdom for
sixty days.   But on the revenue question the Court does not
perceive that the exercise of jurisdiction will have any influ-
ence, for the same power to enforce a discharge exists after, as
before, settlement.

By the law of nations, the jurisdiction of all crimes on the
high seas belongs exclusively to the country to which the ves-
sel belongs, and under whose flag she sails ; but when crimes
and misdemeanors are committed within the jurisdiction of
another country, although in enforcing discipline and order they
were cognizable by that country, and the accused could not be
tried by any other jurisdiction.   By this treaty we yielded the
exercise of jurisdiction of our ports to this extent, unless in-
voked by the Consul of the nation.   But we do not regard the
case of a mariner's wages arising from a contract which termi-
nates here, as this does, as coming within what is meant by
matters of difference touching internal order, as expressed in
the treaty.   The practice of the French marine in always ship-
ping seamen for the voyage, and never discharging them in for-
eign ports, and the duties and obligations which they incur to
the Government, is in direct contrast to the practice of the
American marine, as well as to the obligations of their ship-

Franklin A. Warren *et als. v.* Bark Benjamin Rush.

ment, has unquestionably given to the French construction of the article an extent to which its language, or practice under any other marine, would not suggest.

In the whaling service, full crews are frequently shipped at this port for a cruise for the season only ; and although the contract is made here and terminated here, yet, generally, a settlement is made without appeal to the Court. We claim, however, that the jurisdiction exists, and that it rests in the discretion of the Court when to exercise it. The Hawaiian subjects have a claim on the Court, and so has the domiciled alien—greater certainly than the foreigner. In this case the libellants sailed from this port, where they made their contract, and where it terminated ; this suit arises from the contract to pay wages for services rendered on claimant's vessel, and it must be governed by the principles of maritime law, and not by municipal law. Here the cruise had terminated by the full performance of all the duties required by the contract. It was instituted here for the specific purpose of a season's whaling in the North Pacific, with the agreement to return to this port, and here to be discharged and paid. This presents an entirely different case, as applied to the discretion of the Court, for the exercise of jurisdiction, from a shipment for the entire voyage from a home port. It would be a case of the latter class of unusual circumstances, and which would lead to an utter failure of justice, to induce the Court to assume jurisdiction ; but that they have the jurisdiction is as clear as any other principle of maritime law, and which this Kingdom, from her position in this great ocean, cannot surrender, while she retains a true appreciation of the high purposes, duties and obligations of an Admiralty Court.

Mr. Benedict, in his Admiralty Treatise, p. 159, section 282, says : " There have been attempts in England and in this country to establish an exemption (from jurisdiction) in favor of the seamen of foreign merchant ships. It has been sometimes placed on the ground of the comity of nations ; sometimes on the fancied ground that a vessel is part of the territory of the nation to which she belongs ; sometimes on the ground that there can be no jurisdiction in such cases without the consent of the Consul, or other diplomatic representative of the foreign

nation to which the seaman of the vessel belongs, all of which are fallacious. There is no such comity of nations—nothing within the territory of a nation is without the jurisdiction, and no officer of a foreign Government can grant or destroy the jurisdiction of our Court. . Some exemptions are established by the Constitution, some by treaty, and some by the established and immemorial usage of nations, and they do not apply to persons and property engaged in the ordinary pursuits of commerce. In the present state of international intercourse and commerce, all persons in time of peace have the right to resort to the tribunal of the nation where they may happen to be for the protection of their rights. The jurisdiction of the Courts over them is complete, except when it is excluded by treaty."

Judge Betts says, in the case of Bocker *vs.* Kloskgetu, Abbott's Ad. Rep., 408 : "In one respect, indeed, the American Courts show a greater favor to seamen, in these cases, than do the Courts of Great Britain, for the former proceed, irrespective of any interference on behalf of the seaman by his Consul or other national representative, whilst the English. Courts would seem still to insist that the sanction of such an officer shall be procured unless the nature of the case forbids." He further says that this precautionary condition is not required in the Courts of the United States, and that jurisdiction will ordinarily be exercised if the voyage is terminated.

It has been contended that the 21st Article of the French treaty has the same force and effect as the 8th Article of the Consular Convention between the United States and France. The latter has express reference to the Consular cognizance of matters of difference between captains, officers and crews of merchant vessels of their own nation, which may arise not only in port but at sea ; and particularly refers to the adjustment of wages, and the execution of contract; whereas the article of the Hawaiian treaty confines the Consular cognizance to the internal order on board, and this shall be exclusive in cases where the parties are exclusively of the same nationality of the vessel, and the local authorities shall not interfere unless the public peace and tranquility are disturbed and endangered. This condition renders it conclusive that the article did not refer to the high seas, and equally conclusive when it refers to crimes,

misdemeanors, and other matters of difference in relation to internal order. The intention was to relinquish the exercise of jurisdiction in port over crimes and misdemeanors, which, by the laws of nations, each nation is invested with on the high seas, so that each should enjoy the exclusive jurisdiction of crimes and misdemeanors, not only on the high seas but in port. This was a relinquishment of the exercise of jurisdiction by each nation to that extent, as well as to all matters of difference of internal order on said vessels in port, which refers to the discipline and general administration on board. It has no reference to the adjustment of wages and the execution of contracts, as is expressly contained in the 8th Article of the Convention between the United States and France.

By reference to the 4th Article of the French treaty, it will be seen that the most ample protection is guaranteed to the subjects of both countries, and especially in their access to the tribunals of justice in every degree of jurisdiction established by the laws. It is in these words :

"ARTICLE IV.—Their respective subjects shall enjoy, in both States, a constant and complete protection for their persons and properties. They shall, consequently, have free and easy access to the tribunals of justice in prosecution and defense of their rights, in every instance, and in all the degrees of jurisdiction established by the laws. They shall be at liberty to employ, in all circumstances, the advocates, solicitors or agents of every class that they may think proper ; in fine, they shall enjoy, in all these respects, the same rights and privileges which are or may be granted to native subjects."

By parity, these libellants must enjoy the advantages of this jurisdiction, unless they are controlled by the 21st Article, which, in our view, they are not, and we regard it as somewhat singular that such a forced construction should have been placed on this article. Many ships which visit this place are from distant and remote countries, and engage men at this port for a season's cruise, who are to be discharged here, as in the case before us. On completion of the contract, if the master refuses to pay the amount due to the seamen, the Consul having no judicial power. he cannot enforce the payment, and the seaman is without remedy, for he cannot follow the ship in her wanderings to her dis-

tant home, and it is an utter denial of justice.   There are ships
owned in part at least by parties residing here, as in this case,
and there is no guarantee or assurance they ever will return to
their home port.   This construction would be in gross violation
of provisions contained in our treaties where we guarantee easy
access to the tribunals of justice ; but it is said that the local
authorities may be allowed to interfere if the Consul of the na-
tion approves or consents.   While we do not regard our juris-
diction as thus trammeled or controlled, at the same time we
shall always give great respect and consideration to the opin-
ion, on the propriety of exercising jurisdiction in this particular
class of cases.

The Court here declare that it is with reluctance that they
entertain jurisdiction in cases between foreigners, but they
regard it as an imperative duty, when they come clearly within
the principles of the maratime law, or treaty stipulations.

It appeared in evidence that Mr. Stanley was duly author-
ized by the libellants to effect a settlement of their voyage
with the ship " Benjamin Rush," and in pursuance of said
power he called on Wilcox, the agent and part owner of said
ship, who resides and is doing business here, on the 15th of
November, and inquired when he would be ready to settle
with the crew, as the parties whom he represented were
anxious to know.   After some conversation he said :  " When
I pay off the men they will have to go up to the Consulate."
On the 19th he called again and demanded a settlement, and
the discharge of the parties he represented.   The agent re-
plied :  " When you want a settlement you will have to go to
the Consulate."

It appears that Mr. Stanley called at the Consulate and
stated to the Consul that the three first officers of the " Ben-
jamin Rush," who are the libellants, wanted their discharge,
and after some conversation the Consul sent for Mr. Wilcox to
come to the Consulate, and when he arrived the Consul said,
" Warren must be settled with," and Wilcox replied " that he
had never refused to settle with him," to which Mr. Stanley
replied that he refused to settle with him as his agent.   Wilcox
then said he would settle for 1,600 barrels, as he had with an-
other of the crew.   Mr. Stanley objected to this, and proposed

to wait till the oil was gauged and the bone weighed. On the 23d he understood that the amount of oil and bone was ascertained, and he called again at the Consulate, and the Consul told him that they were going to pay off on Monday. On Monday the parties met at the Consulate and settled the account of Warren. There were some questions of difference which the Consul settled, and they (Stanley and Wilcox) finally agreed on a settlement at $419 49. Mr. Stanley says that Mr. Wilcox handed a bag, which he said contained $2,000, to the Consul's Clerk, and requested him to pay the amount out of it, and he offered to do so, less 2½ per cent. commissions. Mr. Stanley, objected to this charge, and said to Mr. Wilcox the Clerk had not paid him the amount agreed upon, to which he replied that he did not know anything about it ; and after some discussion with the Consul in relation to the propriety of this charge, Stanley left the office.

It appears by the testimony of the Consul, that Mr. Stanley was the first to ask his assistance in the case of Warren. This was designating the place of settlement on his part, and he never objected to the Consulate as a proper place of settlement when it was insisted upon by Mr. Wilcox ; therefore, it may well be considered as fixed by mutual accord. It was a proper place, generally resorted to for settlement ; it was where the ship's papers were, and where each party could appeal to the Consul to settle any matters of difference which might arise. As to the amount due Warren, it was agreed upon after an examination of the accounts by Stanley and Wilcox, but a disagreement arose between the Consul and Mr. Stanley in relation to the commission, and he retired without taking the money proffered for the payment of Warren, and without making any further effort to effect a settlement for Edwards and Beckwith.

Mr. Stanley testifies that Wilcox handed a bag containing money to the Consul's Clerk, stating that it was about $2,000, and requested him to pay him from it. Mr. Stillman testifies that this deposit was made for the disbursement of the crew of the "Benjamin Rush." When parties agree to make a settlement at the Consulate, and the master or agent of the ship deposits the money for the payment of whatever amounts may be

due, and presents a true account of the catchings, he has complied with his duty. If he has any accounts against the seamen, he will of· course present them. The shipping articles contain the terms of the contract, and, from this data, the amount due is easily ascertained. We do not see what more remained for the agent of the ship to do. If there were obstacles interposed by the Consul to prevent Mr. Stanley from attending to the settlement, Wilcox was not responsible for it. The question simply is, Has Wilcox done his duty? After the parties met at the Consulate, we are of opinion that he has, but his mode of doing it has well nigh deprived him of this defense ; and when Mr. Stanley found that it did not accord with the views of the Consul to have him make the settlement there for Beckwith and Edwards, it was incumbent on Mr. Stanley to have so stated to Mr. Wilcox to that effect, and proposed some other place of settlement.

It does not appear that he took this course, but his principals on the following day filed this libel against the ship. Although there may have been occasions in Mr. Stanley's efforts for a settlement when he could have taken the position that Mr. Wilcox had refused his demand, yet after he had called on the Consul for aid in effecting a settlement for these libellants, and he had sent for Wilcox to come to the office and settle Warren's voyage, and in accordance with that request he had come, and being at the place each had selected, they had examined the accounts, and agreed upon the amount due Warren, and in pursuance thereof, he had deposited with the Clerk $2,000, not only to pay Warren, but the rest of the crew, was it not incumbent on Stanley, if he was prevented from making a settlement there for Beckwith and Edwards, to have informed Mr. Wilcox to that effect, and demand a settlement and payment at some other suitable place ? But this was not done—which, under all these circumstances, the Court regard as a legal necessity, antecedent to a suit. We do not regard it as necessary to advert to any other points made in the case by the respondents.

We are of opinion that the judgment of the Court below, so far as it relates to the question of jurisdiction, should be confirmed ; but so far as it sustains the claim of the libellants, (Beckwith and Edwards,) it should be reversed and the bill dismissed.

ROBERTSON, Justice, said :

In all that part of the judgment of the Court, as now announced by the Chief Justice, which relates to the important subject of jurisdiction, I fully concur. But from so much of the judgment as dismisses the libel in this case against the libellants Beckwith and Edwards, as well as the libellant Warren, I respectfully dissent. Under the circumstances, I think the libellants had good right to file their libel, and were well in Court. A sufficient demand, on the part of the libellants, is proven to my satisfaction, and no plea of tender is set up by the defense in the case of Beckwith and Edwards, as in that of Warren ; nor is there sufficient evidence upon the record, in my opinion, to have supported such a plea. The claim of the libellants is admitted to be an honest one, for wages faithfully earned, and which were justly due when the libel was filed. I think, therefore, the libellants, Beckwith and Edwards, are entitled to a decree in their favor ; but I bow with deference to the contrary opinion of the majority of the Court.

Mr. Montgomery, for complainants.

Mr. Harris, for claimants.