## THE MAGGIE HAMMOND.

1. Where a libel was filed against a foreign ship, in an admiralty case, in an admiralty court of the United States, the libellant and claimant both being foreigners, the place of shipping and the place of consignment being foreign ports, and the whole ground of libel a matter which occurred abroad, this court considered the question of jurisdiction open for argument here, though it was not raised by the pleadings, and had not been suggested by any one in the court below.
2. The owner of the cargo has a lien, by the maritime law, upon the ship for the safe custody, due transport, and right delivery of the same.
8. Where a lien exists by the maritime law of foreign jurisdictions, our admiralty has jurisdiction to enforce it here even though all the parties be foreigners. Its enforcement is but a question of comity.
4. *Semble*, that by the law of Scotland, the shipper, where the goods have been sold, lost, or injured during the voyage, may have recourse upon the vessel as a guarantee for the personal obligation of the shipowner.
5 Under the statute of 24th and 25th Victoria, commonly known as the Admiralty Court Act, jurisdiction exists in the English courts of admiralty to enforce by proceedings *in rem* a claim by an owner, domiciled in Canada, of a bill of lading of goods carried into a port of Wales, where the master abandoned the voyage without lawful excuse, improperly entered into a new contract of affreightment, and proceeded on a distant voyage, leaving the goods at the Welsh port, and neither carrying them himse'f to their port of destination, nor seeking to forward them in anothər vessel.

6. Redress may be had in our admiralty courts in the case of a master thus there acting, although the ship have been a foreign vessel, and the shipment made between foreign countries, as Scotland and Canada. And this is so whether the statute be regarded as giving a maritime lien or only a right to sue the ship.

7. The master of a vessel is bound to carry the goods shipped on her to their place of destination in his own ship, unless he is prevented from so doing by the act of God, the public enemy, the act of the shipper, or by some one of the perils excepted in the contract of shipment. When the vessel is disabled in the course of the voyage, and cannot be seasonably repaired to perform it, he is bound to transship the goods and send them forward in another vessel, if one can be had in the same or in any reasonably contiguous port.

APPEAL from the Circuit Court for Maryland, the facts of the case, so far as they presented questions which were passed on by the judgment of the court, having been these:

On the 23d of August, 1866, the Maggie Hammond, a British vessel, being then at Androssan, Scotland, and *owned by a British subject domiciled in Nova Scotia*, took on board for Morland & Co., British subjects also, residents of Montreal, Canada, a cargo of iron, to be transported from Androssan to Montreal. The bill of lading was in the usual form. The vessel, in consequence of stress of weather, which damaged her considerably, put back, after her voyage had been half accomplished, and reaching Milford Haven, on the coast of Wales, anchored there, September 18th. Surveys were held on the 18th and 25th, the result of which was that the ship being found unseaworthy, was ordered to Cardiff, about a hundred and fifty miles further along the coast, for repairs, there being no facilities for landing and storing the cargo at Milford. On the 9th October the master made formal protest at Cardiff, stating that it had been ascertained by surveys that the vessel could not be repaired in time to complete her voyage before the close of the season; navigation in the St. Lawrence being impeded by ice at a comparatively early time in the winter. The vessel was repaired, and on the 3d of November the surveyors certified that she was in a condition to proceed on her voyage. The average voyage from ports of Great Britain to Montreal is from

thirty-five to forty days. The navigation of the St. Law-
rence to Montreal, closed as it appeared, in this year, 1866,
on the 15th December, and was open in the spring of 1867,
on the 22d April. Though, of course, the navigation was
not open in all years alike, and though there was some con-
flict of testimony, the weight of it went to show that it had
not usually, in previous years, closed earlier than this. The
first vessel from sea in the spring of 1867 arrived 4th May.
The agents of Morland & Co., asserting, on the vessel's put-
ting back and returning, that there was no weather or dis-
tress which ought to have compelled her to give up the
voyage, and that she could even now resume the voyage, and
dispute arising on these points, a compromise was attempted.
While, however, negotiations were going on, the vessel
loaded and sailed for Baltimore with another cargo on the
21st November, leaving the cargo of Morland & Co. in store
at Cardiff. The owners of the Maggie Hammond antici-
pated, as they alleged, when their vessel sailed, that she would
be able to complete the voyage to Baltimore and be back at
Cardiff in time for the spring navigation, then to take the
iron aboard and sail to Montreal. But tempestuous weather
made the voyage to Baltimore one of eighty-seven days.
The vessel arrived there only on the 17th February, and was
chartered back, with an expectation by her owners that she
would arrive at Cardiff from the 15th to the 20th of April.
This was nearly a month after vessels for Montreal usually
leave the English ports. The agents of Morland & Co. ac-
cordingly made arrangements with another vessel and for-
warded the iron on her. This vessel sailed May 29th, and
reached Montreal July 22d.

While the Maggie Hammond was at Baltimore, Morland
& Co. libelled her for breach of her contract with them.

The District Court, considering that the repairs were made
in time to have allowed the Maggie Hammond to get off in
the autumn, and that if they were not the master ought to
have foreseen that they would not be, and have sent the
cargo on by another ship, decreed in favor of the libellants;
holding the ship responsible for the difference between the

value of the iron in Montreal on December 15th, 1866, when, as the court considered, it ought to have arrived, and its value in July, 1867, when it did arrive, with interest, &c. The Circuit Court affirmed the decree. The case being here, the questions argued and in issue were these:

I. *One of jurisdiction;* a point not raised in the pleadings nor by any one below, but suggested here by *Messrs. Brune and Browne, for the appellants,* and ordered by the court, through Mr. Justice Clifford, to be argued on these three questions:

1st. Had the libellants a lien upon the ship for the performance of the contract of affreightment at the place where the contract was made, or by the law of the place where the contract was to be performed?

2d. Did the act of the master in landing and storing the goods, and accepting new employment for the ship when the repairs were completed, create a lien upon the ship in favor of the libellants at the place where the cargo was landed, stored, and left?

3d. If the libellants did not acquire any lien, either by the law of the place where the contract was made, or by the law of the place where the cargo was landed, stored, and left, did the District Court have jurisdiction of the libel and of the cause of action therein set forth?

[In connection with these questions it is necessary to state that the British Parliament, in 1861,* by act of the 24th and 25th Victoria, gave jurisdiction to admiralty courts, to be exercised either by proceedings *in rem* or proceedings *in personam,*

"over any claim by the owner or consignee, or assignee of any bill of lading of any goods *carried* into any port in England or Wales in any ship, for damage done to the goods or any part thereof by the negligence or misconduct of, or for any breach of duty or breach of contract on the part of the owner, master, or crew of the ship, unless it is shown to the satisfaction of the court that at the time of the institution of the cause any owner or part owner of the ship *is* domiciled in England or Wales."]

---

* British Stat. at Large, 1861, chap. x, § 6.

II.  *Assuming jurisdiction to exist.*

1st.  Whether the master unnecessarily delayed making the repairs ? a question of fact merely.

2d.  Whether at the date (November 4th) when he was certified that his vessel was in a condition to proceed on her voyage, he could safely have set off for a port so far north as Montreal? another question of mere fact.

3d.  Whether, having believed, as he stated in his protest made at Cardiff on the 9th October that he did, that it had been ascertained that the vessel could not be repaired in time to complete her voyage before the close of the season, he was not bound to have procured another vessel if he could have done so, and forwarded the cargo by *it ?* a question of law.

4th.  Whether he could have procured such other vessel if he had sought for one ? a question of mere fact.

This court assumed, on the evidence, that the master did delay his repairs; that he could have safely set off on the 4th of November; and that he could at an earlier date than this have found other vessels, though he might have had to pay a higher rate of freight than that for which he had himself contracted, and a higher rate of premium for insurance.  So that the only questions of law, and the only questions, therefore, for report, were :

1.  The point of jurisdiction.

2.  The obligation of the shipowners in a case where the facts were as the court here assumed them to be.

*Messrs. Brune and Brown, for the appellants :*

I.  *On the three questions put as to jurisdiction,* went into a very learned argument to show,

1st.  That by the law of Scotland, where the iron was shipped, the libellants had no lien cognizable in courts of admiralty; citing herein the British statute of 1 William IV, ch. 69; Bell, Dictionary of Scottish Law ;* and the case of *The Bold Buccleugh,*† &c.   That the same want of lien

---

\* Tit. Court of Admiralty.          † 7 Moore's Privy Council, 267.

existed equally by the law of Canada, where the owners of the vessel and of the cargo resided; the counsel here citing the language of the Commission to the Vice-Admiralty Courts there, essays by Canadian lawyers,[*] British Statutes,[†] the Lower Canada Reports, and old French Arrêts.[‡]

2d. That the act of the master, in landing the goods and accepting new employment, gave no *maritime lien*, unless one was created by the statute of 24th and 25th Victoria; but that this act did not profess to create maritime liens, but only to confer jurisdiction by proceedings *in rem*,[§] as appeared by the case of *The Pacific*;[||] that there was a great difference between creating a maritime lien and authorizing a proceeding *in rem ;* that the former, if created, would follow the vessel, while the latter, by being merely authorized, came to nothing, unless the proceeding was instituted, and the vessel was a fugitive from justice, which was not the case here.

3d. That there being no maritime lien by the law of England, and the contract being British as to ship, parties, mode of performance, place where made, and place where to be performed—British every way, in short, and without any citizen having any interest in the matter—our courts ought not to originate rights, and to give a privilege which would not be given in the home of the parties.

II. *On the point of the master's obligation.* The learned counsel argued this point elaborately, but the argument was, after all, chiefly on the facts, and to show a case different from that assumed by the court, and presented, of course, as the case by the reporter. There was thus but little presented on the point for report.

---

[*] Preface to Stuart's Vice-Admiralty Reports.

[†] 2 William IV, ch. 51, Acts relating to Canada, 1 Stephens's Commentaries, 6th ed. 110, 112.

[‡] Saisie Arrêts, provided for by Cond. Stat. Lower Canada, ch. 83, §§ 46 and 47.

[§] Baldwin *v.* Gibbon, Robertson's Digest, 361; The Friends, Stuart's Vice-Admiralty Cases, 115.

[||] Browning & Lushington, 246.

*Messrs. Teacle Wallis and J. H. Thomas, contra :*

I. *As to jurisdiction,* having observed that the first and second of the inquiries had a point in common, argued that neither of them could be answered without determining a question of foreign law; that the shipment was made and the bill of lading executed in Scotland; and the cargo was to be delivered in Canada, and was landed and left in Wales; that each of these three places had its separate system of jurisprudence, Wales being governed by the English law; that the Scotch and colonial laws were held by the English courts to be foreign laws, and were required to be proven, as matters of fact, precisely as the laws of foreign nations; and that in the absence of proof—of which there was none here—the foreign law and our own must be presumed to be the same. No suggestion had been made in the pleadings or made below to show that the foreign laws differed in any respect from the general maritime law, as administered by the admiralty courts of this country, and the fact that they did not so differ being thus conceded throughout, the appellees had no reason for taking testimony to establish what was not disputed; *Ennis* v. *Smith,*\* as well as prior cases, precluding the appellant from mooting, in the tribunal of last resort, a question of fact not raised by the record.

The counsel then went into an examination of Scottish authors, seeking to disprove by the writings of Dr. Bell, that which the opposite side cited them to show; and they contended, on his authority and that of other Scotch writers,† that the Scotch admiralty was altogether free from the restrictions and embarrassments which so much narrowed the jurisdiction in England, and was governed, like our own admiralty, by the broader rules and principles of the ancient usages, customs, and ordinances of the sea. It had "the decision of all maritime and seafaring causes," and the rules which governed its jurisdiction and remedies were derived

---

\* 14 Howard, 426–7.

† 1 Bell's Commentaries on Commercial Law, ed. of 1826, 497, 500; Erskine's Institutes, 35 ; and see the American case of The Rebecca, Ware, 190.

from the identical sources to which this court resorted in *Vandewater* v. *Mills*\*, for the principle that "the ship is bound to the merchandise and the merchandise to the ship."

As to the scope and rules of admiralty jurisdiction in Canada, where the cargo in controversy was to, be delivered, they stated that they had found no information in any books within their reach, and they relied on the fact of the difficulty of getting accurate information from books with which the profession here was necessarily unacquainted, and from which, if they knew them, they might derive erroneous ideas—the information being wholly separated from practical knowledge of the matters treated of—as but another illustration of the propriety of requiring all such matters to be established by proof. As to Canadian legislation, they had discovered nothing which threw any light upon the question.

As to the 3d question put, on the point of jurisdiction, while the jurisdiction of the English Admiralty Court to *enforce* the lien by process *in rem* did not exist before the recent statutes of Victoria, it seemed to them clear upon authority that the lien, though not enforceable, nevertheless did exist as part of the English admiralty law.† The elementary writers were stated by them to be unanimous upon this point. Lord Tenterden used the strongest language in regard to it. "That principle of maritime law, therefore," said Kent, "*lays dormant*, from the want of a court of law or equity to enforce it *in rem*."

But whatever difficulty might have formerly existed as to jurisdiction in England, had been entirely removed by the act of 24 and 25 Victoria.

In *The Bahia*‡ and *The Ironsides*,§ the words, "carried into England or Wales," were decided to have been purposely employed in their widest signification, and the statute, it was said, was not intended to be restricted to cases of

---

\* 19 Howard, 90.

† Abbott on Shipping, marg., pp. 126, 127, and 285; 3 Kent, 8th ed. **281**, note *a;* The Rebecca, Ware, 192.

‡ Browning & Lushington, 61.          § Lushington, 458.

importation.   The iron, then, in this case, was carried into a port of Wales.   The sole owner of the ship was domiciled in Nova Scotia, and not in England or Wales.   The complaint is of breach of duty and contract on the part of the master and the ship.   The case, therefore, came directly within the provisions and scope of the statute.   All the discussion about Scott on Canadian law was irrelative.   Unless it could be successfully argued that giving a remedy against the ship by proceeding *in rem* did not impose a lien, there seemed to be no room for dispute as to the existence of the lien by virtue of and under the statute.   The lien having existed previously in England, and nothing having been needed but jurisdiction for its enforcement, there was no necessity of deriving a lien from the statute, and the statute would be regarded as authorizing an enforcement *pro tanto* of a lien already existing.

But the lien was given by the statute; and this was settled notwithstanding some loose language used in *The Pacific*. In *Harmer* v. *Bell*,\* the privy council laid down the doctrine of maritime lien, definitively and exactly, in the language of Story, J., in *The Nestor*.† They say:

"*In all cases where a proceeding in rem is the proper course, there a maritime lien exists,* which gives a privilege or claim upon the thing, to be enforced by legal process.   This claim or privilege travels with the thing into whosesoever possession it may come. It is inchoate from the moment the claim or privilege attaches, and when carried into effect by legal process, by a proceeding *in rem*, relates back to the period when it first attached."

If the injured shipper of goods, under the law of the place where the contract was violated, could have found his remedy by a proceeding *in rem*, the shipowner certainly could not complain that the same proceeding was taken for the same wrong, in a court of corresponding jurisdiction,

---

\* 22 English Law and Equity, 72; and see The Feronia, Law Reports, 2 Admiralty and Ecclesiastical, 73; The Ella A. Clark, Browning & Lushington, 32.

† 1 Sumner, 78.

where the offending *res* was found. The proceeding *in rem*, after all, was but "a mode of proceeding and process," as defined by this court,* and its allowance or refusal constituted no "question of jurisdiction."

The fact that all the parties to this proceeding were aliens did not, in itself, and at this stage of the cause, furnish any ground for ousting, or even doubting, the jurisdiction. The lien, as between foreigners, was always administered in our courts by process *in rem*, on principles of comity.† It was a matter of sound judicial discretion and not of jurisdiction, and like all matters of discretion could not be the subject of revision in the Supreme Court, or a ground of appeal to it. In the present case, the exercise of the discretion was not only lawful but just. The port of Baltimore was much nearer to the places of residence of both parties than any port of Great Britain. It was as easy of access to one party as the other, and the ship was within the jurisdiction of the District Court of Maryland, a fugitive, as it were, from her duty.

II. On the point of the master's obligation, the counsel replied to the argument of the other side, as to what the case on the evidence was; showing it to be that given by the reporter, and on which the law was scarcely a matter of question.

Mr. Justice CLIFFORD delivered the opinion of the court.

Common carriers by water, like common carriers by land, in the absence of any legislative provisions prescribing a different rule, are insurers of goods shipped, and are liable in all events and for every loss and damage, however occasioned, unless it happens from the act of God or the public enemy, or by the act of the shipper, or from some other cause or accident expressly excepted in the bill of lading.

Whenever the goods intended for transportation are ship-

---

* The St. Lawrence, 1 Black, 526; The Potomac, 2 Id. 581.

† Mason *v.* The Blaireau, 2 Cranch, 240; Davis *v.* Leslie, Abbott's Admiralty Reports, 131; The Jerusalem, 2 Gallison, 191; The Bee, Ware, 332; The Howard, 18 Howard, 231; The Ada, Davies, 409.

ped on board, or delivered to the carrier or his agent for that purpose, it is the duty of the master, in the absence of any stipulation as to the period of sailing, to commence the voyage within a reasonable time, and he must proceed on the voyage in the direct and usual route to the port of delivery without any unnecessary deviation. Unless it becomes necessary to deviate for the purpose of making repairs or to avoid a storm, or an enemy or pirates, or to obtain necessary supplies, or for the purpose of assisting another vessel in distress, no deviation from the direct and usual route can in general be justified, nor will any other cause be admitted, except under very special circumstances, as a valid defence for any such delay in the transportation of the goods shipped under the bill of lading or other legal contract of shipment.

I. Certain parcels of pig-iron, amounting in the whole to three hundred tons, consigned to the libellants, were, by their agents, resident in England, shipped August 23d, 1866, on board the Maggie Hammond, then lying at Ardrossan, Scotland, and bound on a voyage from that port to the port of Montreal, where the libellants reside. By the bill of lading, it appears that the iron constituting the consignment was shipped in good order and condition, and that the contract of shipment was that it should be delivered to the consignees at the port of destination in like good order and condition, " the act of God, the Queen's enemies, fire, and all and every other dangers and accidents of the seas, rivers, and navigation, of whatever nature and kind soever, excepted."

Subject to the terms of that contract the merchandise in question was delivered to the carrier; and having been duly laden on board, the ship sailed on the following day for the port of delivery, and until the seventh of September she proceeded on her voyage in perfect safety, when she encountered heavy gales which continued through the night, causing the ship to leak, and doing great damage to the sails; and it appears that the master, at six o'clock in the afternoon of that day, finding that the weather exhibited no appearance of improvement, and having consulted with the

other officers of the vessel, and the crew, decided to beal away for some port of refuge, and that "they wore ship with her head to the eastward."

Prior to that change of course they had accomplished half the contemplated voyage, as it appears from the evidence that the ship, at noon of that day, was in latitude forty-nine degrees one minute north, and in longitude thirty degrees sixteen minutes west. Precisely what change was immediately made in the course of the ship does not appear; but it does appear that the master, on the following day, called the crew aft, and submitted the question to them whether they would go to the westward, or continue to go to the eastward, and that they decided to proceed to the eastward, which was equivalent to a decision to return. Much injury had doubtless been done to the sails, but they had spare sails, and it appears that the crew, before they were called aft, had bent and set the foresail, the maintopsail, the jib, the foretopmast staysail, the maintopmast staysail, the mizzen staysail, and the spanker, and the protest shows that the wind had subsided, and that the weather was more moderate.

Principal reason given by the crew for refusing to go westward, as reported in the protest, was, that they had not sufficient sails, that the ship was leaking badly, and that they were not able to do any more work until they had some rest.

Midway between western and eastern ports, and with a ship as seaworthy to go forward as to go back, the master nevertheless yielded readily to the suggestions of the crew, and decided to proceed to the eastward, and on the seventeenth of September the ship came to anchor, without any further damage, in the port of Milford, in Wales. Immediate steps were taken for a survey, which was held on the following day, but some of the recommendations of the surveyors were not satisfactory to the master, and he declined to carry them into effect. Dissatisfied with the results of that survey he called another, which was not held until the twenty-fifth of the same month, when it was recommended

that the ship should proceed to Cardiff, where there were greater facilities for landing and storing the cargo and for repairing the vessel. Influenced by that recommendation the master, two days afterwards, weighed anchor, and the ship having been taken in tow by a steamtug, arrived at Cardiff on the next day and was safely moored for repairs in the dry-dock at that port. Subsequent surveys were also held, confirming the prior conclusion that the ship was in need of repairs, and thereupon the cargo was landed and stored. Expenses were incurred in executing the repairs to the amount of one hundred and eighty-five pounds and seventeen shillings, but the mechanics in accomplishing the work, stripped the vessel of her yellow metal, valued at one hundred and thirty pounds, which was allowed as a credit to the owner of the ship.

On the ninth of October the master made a formal protest, that the repairs recommended could not be completed until the season would be too far advanced for the ship to complete the voyage before winter. Her repairs were finished prior to the third of November, and on that day the surveyors certified that the ship was in a " seaworthy state to proceed on her intended voyage." Although the ship was ready for sea, still the master refused to reload the cargo and proceed to fulfil his contract, alleging that the season was too far advanced. Negotiations were instituted between the consignees and the owner of the ship for a compromise of the controversy, but before any conclusion was reached the ship, on the twenty-first of November, took on board another cargo and sailed for Baltimore, leaving the merchandise constituting the consignment of the libellants in store at the port where the repairs were made.

Left in store the merchandise remained there until the twenty-ninth of May of the next year, when the agents of the ship forwarded the same in another vessel, but the vessel with the goods did not arrive at the port of delivery until the twenty-second of July, eleven months after the iron was shipped on board the vessel of the respondent. Aggrieved by such unusual delay and learning that the ship had ar-

rived at her port of destination, under the new contract of affreightment, the shippers and consignees of the iron stored and left at Cardiff, filed their libel in the District Court for the district where the ship then was, alleging a breach of the contract set forth in the bill of lading. Process of attachment was issued and the ship was seized on the 26th of February, 1867, the day before she finished discharging her cargo at Baltimore. Hearing was had and a decree was entered in favor of the libellants in the District Court for three thousand and ninety-two dollars and thirty cents, together with costs of the proceedings. Determined to contest the matter further the claimant appealed to the Circuit Court, and the appeal to this court is from the decree of the Circuit Court affirming the decree of the District Court.

II. Several questions of importance and of no inconsiderable difficulty are presented for decision in this case. Most of the material facts are exhibited in the preceding statement, and in view of that state of facts the libellants submit the following propositions:

1. That it was the duty of the master, as the agent of the shipowner, to transport the merchandise to the port of destination and deliver the same to the consignees without unnecessary delay, unless he was prevented from so doing by the act of God, the public enemy, or some one of the perils expressly excepted in the bill of lading; and that the evidence in the case does not show that the failure to transport and deliver the consignment was occasioned by any such causes.

2. That the ship, when she sprung aleak, and when her sails were injured, inasmuch as she was as near to western ports as to those situated to the eastward, should have proceeded to some one of the former for repairs, and that the circumstances did not justify the master in putting back to an eastern port for that purpose.

3. That if he was justified in putting back to the port selected as a port of refuge, that his subsequent conduct in respect to the merchandise shipped by the libellants was wholly indefensible; that he had no right to leave the mer-

chandise in store, enter into a new contract of affreightment, and sail with a new cargo for a distant port; that he was bound, as a carrier for hire, either to repair his own vessel, reload the cargo and resume and complete the voyage, as stipulated in the bill of lading; or, if the necessary repairs could not be made in season to enable him to fulfil his contract to transport and deliver the consignment before the fall navigation would close, then it was his duty to procure another vessel and to transship the merchandise and send it forward to the port of delivery without unnecessary delay.

All of these propositions are controverted by the appellants, and they contend that the conduct of the master was in all respects justifiable; that he did everything which he, as such carrier, was required to do under the contract as expressed in the bill of lading, and that the libellants have no just cause of complaint.

Aside from the merits of the controversy, they also contend that the District Court had no jurisdiction of the case; and as that is a preliminary question it will be first considered before examining the questions more immediately involved in the pleadings. No such question is directly presented in the pleadings, and none such was raised in the court below, still the better opinion is that the question is open to the appellants, as it substantially appears that the home port of the ship is Yarmouth, Nova Scotia, and that both the libellants and claimant are foreigners. By the answer it appears that the claimant is a resident of the place where the ship belongs, and the libel describes the consignees as residents of Montreal, in Canada, and that the iron was shipped at Ardrossan, in Scotland.

Undoubtedly the owner of the cargo has a lien, by the maritime law, upon the ship for the safe custody, due transport, and right delivery of the same, as much as the shipowner has upon the cargo for the freight, as expressed in the maxim, *Le batel est obligé à la marchandise et la marchandise au batel.* Subject to the exception that the lien of the shipowner may be displaced by an unconditional delivery of the goods

before the consignee is required to pay the freight, or by an inconsistent and irreconcilable provision in the charter-party or bill of lading, the rule is universal as understood in the decisions of the Federal courts, that the ship is bound to the merchandise and the merchandise to the ship for the performance on the part of the shipper and shipowner of their respective contracts.

Shipowners contract for the safe custody, due transport, and right delivery of the cargo, and for the performance of their contract the ship, her apparel and furniture, are pledged in each particular case, and the shipper, consignee, or owner of the cargo, contracts to pay the freight and charges, and to the fulfilment of their contract the cargo is pledged to the ship, and those obligations are reciprocal, and the maritime law creates reciprocal liens for their enforcement.[*]

Consequently where the lien or privilege is created by the *lex loci contractus*, says Judge Story, it will generally, although not universally, be respected and enforced in all places where the property is found or where the right can be beneficially enforced by the *lex fori*.[†]

Such a lien is regarded as being in effect an element of the original contract, but in controversies wholly of foreign origin, and between citizens and subjects of the same foreign country, the admiralty courts of the United States will not, in general, entertain jurisdiction to enforce the maritime lien or privilege in favor of shipper or shipowner, in a case where the libellant would not be entitled to such a remedy in the place where the contract was made or where the cause of action set forth in the libel accrued.[‡]

---

[*] The Eddy, 5 Wallace, 493; Dupont *v.* Vance, 19 Howard, 168; The Bird of Paradise, 5 Wallace, 554; Alsager *v.* Dock Co., 14 Meeson & Welsby, 798; Foster *v.* Colby, 3 Hurlstone & Norman, 715.

[†] Story on the Conflict of Laws (6th ed.), 428; 3 Burge's Commentaries, 770, 779

[‡] The Infanta, Abbott's Admiralty, 267; Whiston *v.* Stodder, 8 Martin's (Louisiana), 134; The Havana, 1 Sprague, 402; The Jerusalem, 2 Galison, 191; The Kenneway, Abbott's Admiralty, 321; Brig Napoleon, Olcot, 215; Brig Nestor, ˙ Sumner, 73; New Brig, 1 Story 244; Pope *v.* Nickerson, 3 Id. 465–476

Where the lien exists only by some local statute, and is not given by the maritime law, admiralty courts in another jurisdiction can no more take jurisdiction of a case not within the local statute than the courts of the country could do where the cause of action arose, but where the lien is given by the maritime law the question in such a case, in the admiralty courts of the United States, is not one of jurisdiction but of comity, as the jurisdiction to enforce a maritime lien for the breach of a contract of affreightment, either original or appellate, is, beyond controversy, conferred on all the Federal courts by the Judiciary Act.

Courts of justice, and text writers, everywhere concede that the ship, under the maritime law, is bound to the merchandise and the merchandise to the ship, independent of any local usage or statute; but it is true, as suggested by the appellants, that such a lien cannot be enforced in some countries, because the courts of admiralty, which alone are competent to give effect to the same by a proceeding *in rem*, are not, as now constituted, invested with any authority, except to a very limited extent, to exercise such a jurisdiction.

Maritime liens are of little or no value, in a country where there are no appropriate tribunals for their enforcement, as they must remain dormant and unavailable, but the denial of such jurisdiction to her admiralty courts, by one country, whether it be by legislation or by the prohibitions of her common law courts, cannot have the effect to impair or diminish the jurisdiction in such cases of the admiralty courts of any other country, if they are legally clothed with the power and authority to enforce such remedies for the breach of a maritime contract.*

Such a remedy will not in general be accorded, in our courts of admiralty, to the citizens or subjects of a foreign country whose courts are not clothed with the power to give the same remedy in similar controversies to the citizens of the United States, but the question whether they will do so or not is not a question of jurisdiction in any case, as it is

* The Rebecca, Ware, 190; The Phebe, Ib. 270; Abbott on Shipping (ed. 1854), 167.

clear they may do so if they see fit, and in some cases they will take jurisdiction to prevent loss and injustice, especially if no objection is made by the consul of the nation to which the vessel belongs.*

Viewed in the light of these suggestions the case seems to be one where the jurisdiction may be sustained without difficulty, even though it be true that the shipper had no lien upon the ship by the law of the place where the contract of shipment was made. Appellants contend that the law of the place where the contract was made gives no such lien to the shipper in any case, but there is very respectable authority for a different opinion, independent of the usual presumption that the law of the place where the contract was made is the same as that of the forum where the remedy for the breach of it is sought.†

Maritime law, says a learned commentator upon the law of Scotland, partakes more of the character of international law than any other branch of jurisprudence; and he adds, what is more material to the present inquiry, that in all the discussions respecting the same in the courts of that country the continental collections and treatises on the subject are received as authority by their judges where not unfitted for adoption there by any peculiarity which their practice does not recognize. Reference is then made to the principal continental treatises, usually referred to here, and frequently recognized by this court as the sources from which the rules of the maritime law were drawn.‡

Speaking of the power and authority of the master of the ship, the same commentator says that he may hypothecate the ship for the supply of necessaries, and, as a last resort, he may sell the ship and cargo for that purpose. Abroad he has full authority to enter into a charter binding the owners

* The Havana, 1 Sprague, 402; The Volunteer, 1 Sumner, 555; The Spartan, Ware, 145; Harmer v. Bell, 22 English Law and Equity, 72.

† Chase v. Insurance Co., 9 Allen, 311; Leavenworth v. Brockway, 2 Hill, 201; Story on the Conflict of Laws, § 637.

‡ Vandewater v. Mills, 19 Howard, 89; 1 Bell's Commentaries (6th ed.), 864; Dupont v Vance, 19 Howard, 168.

and the ship, and he cites in support of that proposition the continental writers usually referred to as authority for that well-known rule of maritime law.*

Shipowners, the author says, have a lien as carriers for the security of the freight, and that the shipper, where the goods have been sold, lost, or injured, during the voyage, may have recourse upon the property of the vessel as a guarantee for the personal obligation of the shipowner.   He admits that the rule last mentioned is not generally followed in England, and that there is no adjudged case to that effect in the courts of Scotland, but he insists there is in their jurisprudence no reason for denying the privilege given in such cases by the maritime law, and he expresses the opinion that such a remedy would be sustained in their courts.†

Suppose, however, that neither of the preceding propositions are correct, still it is clear that the jurisdiction in this case may be sustained upon another ground.   Two causes of action are set forth in the libel, and before entering further into the discussion of the question of jurisdiction it becomes necessary to ascertain what they are and where they respectively arose, as alleged in the libel and as shown in the evidence.   Obviously the first cause of action is founded solely on the alleged failure of the shipowner to fulfil the contract of affreightment to transport the iron from the place of shipment to the port of destination, and to deliver the same to the consignees.

Non-delivery of the merchandise is the gravamen of the charge set forth in both articles of the libel, but the libellants also allege that the master, after the ship departed on her voyage, abandoned the same, and made some improper disposition of the shipment; that he neglected to transport and deliver the same, and that he entered into a new contract of affreightment with another party, and that the ship subsequently sailed for the port of Baltimore, in charge of another master, not having the iron of the libellants on board.

Subsequent to the landing and storing of the goods the shipowner discharged the master and appointed another in

---

* Dupont v. Vance, 19 Howard, 162.                † Ibid. 440.

his place, and the ship took another cargo on board and sailed for the port where the process was served in this case, the shipowner claiming the right so to do upon the ground that the season was too far advanced for the ship to proceed to her port of destination, and insisting that he might lawfully detain the shipment until spring, in order that the ship might complete the voyage and earn full freight.

In determining the question of jurisdiction the court must assume that the several propositions submitted by the libellants in respect to the merits of the controversy are correct. Assume that to be so, then it follows that the master improperly put back for repairs; that he abandoned the voyage without any lawful excuse ; that he improperly entered into a new contract of affreightment, subjecting the ship to new perils and to a new lien, and that she had proceeded on a distant voyage, leaving the consignment of the libellants at the port where the same was stored at the time the iron was landed from the ship.

Landed and stored as the merchandise was in Wales, the question is, whether the refusal of the master either to transport the goods in his own ship or to transship the same and send the shipment forward in another vessel, and the subsequent abandonment of the voyage, gave the shippers and consignees any lien on the ship by the law of the country where those wrongful acts of the master took place.

Jurisdiction is possessed by the Admiralty Court of England " over any claim by the owner or consignee, or assignee of any bill of lading of any goods *carried* into any port in England or Wales in any ship, for damage done to the goods or any part thereof by the negligence or misconduct of, or for any breach of duty or breach of contract on the part of the owner, master, or crew of the ship, unless it is shown to the satisfaction of the court that at the time of the institution of the cause any owner or part owner of the ship is domiciled in England or Wales."*

Prior to that enactment the jurisdiction thereby conferred

---

* 24 and 25 Victoria, Pub. Gen. Stat., 1861, ch. 10, § 6, p. 132; Williams & Bruce, Admiralty Practice, 85.

could not have been exercised by that court, and conse-quently the extent of the jurisdiction depends entirely upon the meaning of that provision.   By the words of the act the jurisdiction conferred is confined to the case of goods *carried. into England or Wales*, and it is equally clear that the claim must be made by the owner or consignee, or by the assignee of the bill of lading, but it cannot be denied that the case before the court in all those respects comes within the very words of the enactment.

As construed by the courts of that country the intent of the act is to give a remedy to the owner or consignee when-ever the ship arrives in a British port and the cargo is not duly delivered in consequence of a breach of contract or duty on the part of the owner, master, or crew of the ship; and the meaning has been so extended by construction that the admiralty court will entertain a claim for short delivery of the cargo, or a case where the goods are only incidentally brought into a port in England or Wales, the court holding that the word *carried* is not used in the sense of imported, but that it includes every case of a breach of contract or duty by the carrier whenever the ship arrives in a British port.*

Where the master of a ship, on a voyage from New York with cargo consigned to Dunkirk, put into a port in England in consequence of an accident, and there landed the cargo and refused either to give delivery of it there or to carry it on to its destination, the court held that there was a clear breach of duty over which it had jurisdiction.†

Special reference is made by the appellants to the case of *The Pacific*,‡ as showing that the sixth section of the Admi-ralty Court Act gives merely a conditional right to sue the ship, that it does not create a maritime lien; but the decision in that case is not an authority for the proposition as applied to the case before the court, as the conclusion would be in-

---

* The Danzig, Browning & Lushington, 102; The St. Cloud, Ib. 14.

† The Bahia, Browning & Lushington, 61; The Norway, Ib. 227; The Ironsides, Lushington's Admiralty, 458.

‡ Browning & Lushington, 243.

consistent with what the same learned judge decided in the case of *The St. Cloud*,* where he said the act was intended to operate by enabling the party aggrieved to arrest the ship in cases where, from the absence of the shipowner in foreign parts, the common law tribunals could not afford effectual redress.

Effectual redress in such a case cannot be afforded, even in an admiralty court, without authority to arrest the ship; and wherever that authority exists the proceeding may be *in rem*, which is an admiralty proceeding, founded upon a lien; and it makes no difference whether it is held in the courts of the particular jurisdiction, that it exists by maritime usage, or that it was created by statute, if it be of such a character that it is recognized in our courts as a maritime lien. Extended argument upon the subject, however, seems to be unnecessary, as the later decisions in the admiralty courts of that country have disapproved of the prior decisions, and adopted a more liberal construction of the sixth section of the act.†

Tested by these suggestions the better opinion is that the sixth section of that act does give a maritime lien in a case like the present; but suppose it is otherwise, that it merely gives the right to sue the ship, still the concession cannot benefit the appellants, as the admiralty courts here administer the foreign law, and the consequence is that the filing of the libel in the District Court here secures to the libellant the same lien in the ship as if the libel had been filed in his behalf in the jurisdiction where the wrongful acts set forth in the libel were committed.

Process *in rem* is founded on a right in the thing, and the object of the process is to obtain the thing itself, or a satisfaction out of it, for some claim resting on a real or *quasi* proprietary right in it. Unless, therefore, the suit *in rem* can be prosecuted in the jurisdiction where the property is found it cannot be prosecuted at all, as the suit cannot be main-

---

* Browning & Lushington, 14.

† The Nepoter, Law Rep., 2 Adm. & Eccl. 376; The Beta, Law Rep., 2 Privy Council Cases, 447.

tained without service of process upon the property described
in the libel.*

Process having been duly served in the district where the
ship was found and where the libel was filed, the jurisdiction
of the District Court is without any well-founded legal ob-
jection. In this country, says Mr. Parsons, it seems to be
settled that our admiralty courts have full jurisdiction over
suits between foreigners, if the subject-matter of the contro-
versy is of a maritime nature, but the question is one of
discretion in every case, and the court will not take cogni-
zance of the case if justice would be as well done by remit-
ting the parties to their home forum.†

Jurisdiction being established it becomes necessary to ex-
amine the merits and to state our conclusions whether the
decree from which the appeal was taken should be reversed
or affirmed.

Grave doubts are entertained whether the master was jus-
tified in putting back for repairs, as he was quite as near to
western ports as to those situated to the eastward, and the
record furnishes no reason to conclude that he would have
encountered any greater perils or difficulties in proceeding
to the westward than he did in putting back to the port se-
lected as the port of refuge; but it is not necessary to pursue
that inquiry, as it is not the intention of the court to rest the
decision upon that ground.

Ships, to be seaworthy, ought in general to have spare
sails where the voyage is a long one, and if the ship in this
case was properly furnished in that behalf the conduct of the
master in putting back for the reasons assigned in the pro-
test is quite indefensible, as it is clear that he might have
gone forward just as safely, and if he had done so it cannot
be doubted that he might have gone to any one of a half-

---

* The Propeller Commerce, 1 Black. 581; The Reindeer, 2 Wallace, 403;
Nelson v. Leland, 22 Howard, 48.

† 2 Parsons on Shipping, 226; The Johannes Christoph, 2 Spink, 98; The
Jerusalem, 2 Gallison, 191; The Aurora, 1 Wheaton, 96; Taylor v. Carryl,
20 Howard, 611; The Gazelle, 1 Sprague, 378.

dozen western ports where he could have repaired his ship in ample season to have enabled him to complete the voyage, deliver the cargo, and return to the open sea without the least danger of any obstruction from ice in the river navigation. None of these matters, however, were much urged by the appellees at the argument, and they are accordingly passed over without further remark.

Grant that the conduct of the master in putting back is without objection, and that he was justified in landing and storing the goods with a view to a survey, and for the purpose of repairing the ship, the question then is whether his subsequent conduct in refusing, after the repairs were finished, to complete the voyage or to procure another vessel, transship the goods, and send them forward, and in sailing for another and a distant port under a new contract of affreightment, leaving the goods of the libellants in store, without making any provision for their transportation and delivery, constitutes a breach of the contract of affreightment made with the shippers of the goods, as set forth in the bill of lading.

As agent of the owners the master is bound to carry the goods to their place of destination in his own ship, unless he is prevented from so doing by the act of God, the public enemy, or by the act of the shipper, or from some one of the perils expressly excepted in the contract of shipment. When the vessel is wrecked, or otherwise disabled in the course of the voyage, and cannot be seasonably repaired to perform the voyage, or cannot be repaired without too great delay and expense, the master is at liberty to transship the goods and send them forward in another vessel, so as to earn the whole freight, but he is not entitled to recover for freight if he refuses to transship the goods, unless he repairs his own vessel within a reasonable time and carries them on to the place of delivery.

He is not only at liberty, in case of such a disaster, to transship the goods and send them forward, but it is his duty to do so, if he cannot repair his own vessel in a reasonable

time, and if another vessel can be had in the same or a con
tiguous port, or at one within a reasonable distance; and in
that event he is entitled to charge the goods with the in-
creased freight arising from the hire of the vessel so pro-
cured.*

Shipments are made that the goods may be transported to
the place of delivery, and the master should always bear in
mind that it his duty to accomplish that object.   Inexcusable
delay occurred before it was ascertained what repairs were
necessary, and before the work was actually commenced.
They came to anchor in Milford Haven on the seventeenth
of September, and a survey was called on the following day,
but the master was dissatisfied with the result, and on the
twenty-fifth of the same month he called another, so that
the ship did not arrive at the port where the repairs were
made until the twenty-eighth of the month, ten days after
her arrival at Milford.

Duties remain to be performed by the master or the owner,
after the vessel is disabled.   His obligation of safe custody,
due transport, and right delivery still continues and is by no
means discharged or lessened while it appears that the goods
have not perished in the disaster.†

Nothing will excuse the carrier under such circumstances
but the causes stipulated in the bill of lading, and he is still
bound by virtue of his original contract to use his utmost
exertions to transport or send forward the goods to the port
of delivery.   Such carriers may be answerable for the goods
in case of loss or injury, even though no actual blame can
be imputed to them; and after the loss or injury is estab-
lished the burden lies upon the respondent to show that it
was occasioned by one of the perils excepted in the contract
of shipment or bill of lading.‡

Diligence and promptitude were due in this case from the

---

* Niagara v. Cordes, 21 Howard, 24.

† King v. Shepherd, 3 Story, 358; Elliott v. Rossell, 10 Johnson, 7.

‡ Clark v. Barnwell, 12 Howard, 272; Rich v. Lambert, Id. 347; Chitty
on Carriers, 242; Story on Bailment, §§ 528–529; 3 Kent, 213; 1 Smith's
Leading Cases, 313; Smith Mercantile Law, 348.

master, especially if he believed that there was any danger that the time which would be occupied in making the repairs would render it impracticable to carry forward the goods before the close of the fall navigation; and if he was of the opinion, in view of all the circumstances, that the repairs could not be completed in season to transport the goods to the port of delivery, he was bound to procure another vessel, transship the goods, and forward them to the consignees.

Much testimony was introduced by the appellants to show that another vessel could not have been procured, but most of it is not of a character to apply to the case before the court. Bound to keep safely, duly transport, and rightly deliver the goods, it is no defence for the carrier to allege that the price of freight at that time was higher than it would have been earlier in the season, as the charge for the increased price would have fallen upon the goods and not upon the appellants. They had contracted to transport the goods, and it is no defence to a suit for the breach of the contract that the rate of the insurance at that time was higher than it was earlier in the season. Excuses of the kind constitute no defence to such an action, as the carrier is bound to perform his contract unless he is prevented from so doing by the act of God, the public enemy, or by the act of the shipper, or from some other cause or accident expressly excepted in the bill of lading or contract of shipment.

Under the circumstances of this case the appellants were bound to transport the goods in their own vessel, or to procure another and send them forward to the port of delivery. Opposed to this view is the suggestion that they were not bound to transship immediately, as they had the right to detain the goods and repair their own vessel for that purpose; but the decisive answer to that suggestion is, that they had no right to detain the goods for any such purpose, unless the repairs could be made in time to enable the ship to transport the goods to the port of delivery before the navigation closed.

Without entering into the details of the evidence, suffice it to say, the court is of the opinion that another vessel might

have been procured for that purpose, and that it was the duty of the master to have transshipped the goods unless he could repair his own vessel in season to complete the voyage.*

Aside from that proposition, however, the court is of the opinion that the repairs were finished in season to have enabled the master to transport the goods in his own vessel, and it is clear that he was bound to do so unless he was prevented by some one of the causes expressed in the bill of lading.   Mere fear that he might encounter ice in the voyage, or that he might not be able to return till spring, if he transported the goods to the port of delivery, constitutes no defence, as he was bound by his contract to complete the voyage without unnecessary delay, unless, as before explained, he was prevented by some one of the causes expressed in the bill of lading.   His ship was fully repaired on the third of November, and the navigation did not close until the fifteenth of December following, which would have given him ample time to deliver the cargo and complete the voyage.   Forty days would have been a long voyage, and probably it might have been accomplished in thirty-five.

Viewed in any light, as shown by the evidence, the decree of the Circuit Court is correct.

DECREE AFFIRMED.

* Cannan *v.* Meaburn, 8 Moore, 141.