## THE JASON.

## OLIVER & ROBERTS WIRE Co., Limited, and another v. THE JASON.

*(District Court, D. Maryland.   April 14, 1886.)*

1. **SHIPS AND SHIPPING—DISABLED STEAMER RETURNING TO PORT FOR REPAIRS —RESPONSIBILITY FOR DETENTION.**

   The Jason, a Dutch steam-ship, sailed from Amsterdam for Baltimore on seventeenth November, 1883.   Being disabled by accident to her machinery, she put back, and was detained at Amsterdam until eighteenth March, 1884. During the repairs the cargo was not discharged.   One shipper had on board 200 bales of beans, a perishable article, which by the detention were damaged. Upon return of the steam-ship to Amsterdam the shipper of the beans notified the agents of the steamer that they ought to be forwarded at once.   The reply was misleading, both as to the time the ship would be detained for repairs, and as to the difficulty of discharging the beans.   *Held* that, the beans being known to be perishable, the ship was liable for loss by the deterioration and decay resulting from their having been kept so long in the hold of the ship.

2. **SAME—CARE OF CARGO.**

   Another shipper had on board 300 tons of steel-wire rods.   Upon arrival they were found to be rusted to an extent which caused the owner an increased expense of three dollars per ton in manufacturing them into wire. No notice was given to the owner of the iron with regard to the detention. *Held.* upon the proof, that it was impossible to have transhipped and forwarded the wire rods to Baltimore, except at an expense for freight which, under the circumstances, would have been unreasonable; and that the cost of discharging them from the ship, and storing on shore during the repairs, would have been so great that a prudent owner would have risked the rusting on board, rather than have incurred the expense of discharging, storing, and reshipping.   *Held,* that the delay was not the fault of the ship-owners, and that the owner of the wire rods had not been prejudiced by the want of notice, nor by the manner in which the rods had been cared for during the detention.

In Admiralty.   Libel for damage to cargo.

*Cowen & Cross,* for libelant.

*T. W. Hall,* for petitioner.

*T. R. Clendenin,* for respondent.

MORRIS, J.   These suits are instituted by the owners of two shipments of goods shipped on the steam-ship Jason, to be transported from Amsterdam to Baltimore.   The Jason, sailing under the Dutch flag, and owned in the port of Amsterdam, had been running at regular intervals to the port of Baltimore under the control of the Netherlands American Steam Navigation Company, a Dutch corporation. She sailed on this voyage on the seventeenth November, 1883. Three days afterwards, in the English channel, she broke the slide-valve of her low-pressure engine, and went into Dartmouth, where she had it repaired, and sailed on the 22d.   She continued on her voyage until the 27th, when, being about 1,000 miles from Amsterdam, and having accomplished only about one-third of her voyage, and while laboring in a heavy sea, the crank-shaft of the high-pressure engine broke, in consequence of which, before the engine could be stopped, the high-pressure cylinder cover was broken in pieces, the

engine foundation was shattered, and the high-pressure piston was broken and bent. The steamer was then disabled from proceeding on her voyage, and the engine having been constructed at Amsterdam, about two years before, and that being her home port, the master determined to return there for repairs. Using her low-pressure engine, and assisted by favoring winds, she arrived back in Amsterdam about December 4th, without further mishap. Upon examination it was found that the high-pressure engine would have to be almost entirely reconstructed. The work was pushed with energy, but it required in all three months before the steamer was again ready for sea; so that she was detained at Amsterdam until the eighteenth March, when she sailed again for Baltimore, and arrived on the twelfth April, 1884.

The libelant, the Oliver & Roberts Wire Company, had on board 10,347 bundles of steel-wire rods, weighing about $321\frac{1}{2}$ tons, and the petitioner, Stellman, had on board 200 bales of beans; and for these two shipments bills of lading had been issued, at Amsterdam, in usual form. The iron rods were to pay six shillings per ton freight, and the beans fifteen shillings per ton. The iron was worth, in Baltimore, about $30 per ton, and the beans $700 per ton. Upon arrival in Baltimore the iron rods were found to be damaged by rust, beyond the rust of an ordinary voyage, to an extent which caused the wire company an increased expense in manufacturing them into wire, which they estimate at three dollars per ton. The beans were landed in other bags than those in which they had been shipped, and had ceased to be merchantable. They emitted an offensive smell, were all more or less discolored and mouldy, and in considerable part rotted. The owner of the beans paid the freight, and had them properly cared for; but about one-fourth proved worthless for any purpose, and the remainder were disposed of with difficulty. The owners of these two shipments are now proceeding to recover from the ship the losses they have sustained by reason of the deterioration of their goods, and the delay in delivering them.

There is nothing in the testimony that tends in any way to show that the Jason was unseaworthy when she first sailed, nor that the master was not justified in putting back to Amsterdam as a proper port in which to repair the accident to the steamer's engine. It was not the nearest port, but it was the place in which the engine had been recently constructed, and where, presumably, it could be speedily and properly repaired, under the direct supervision of the owners. Nothing that happened to the date of the steamer's return to the port of Amsterdam appears to have been the result of anything but perils of the sea, excepted in the bills of lading, and the right of the shippers to recover in this action must be based upon some neglect of duty on the part of the owners of the steamer after her return to Amsterdam for repairs. During the repairs the cargo was not discharged, but all remained on board, except a portion which was removed from the after-hold to get to the tunnel shaft.

The libelants put their claim upon two grounds: (1) That the owners were bound to tranship and forward the goods to their destination in another vessel, as soon as the Jason returned, and it was found that she would be three months detained for repairs; (2) that, even if the owners were at liberty to retain the goods for such a period in order to earn freight by completing the voyage, it was their duty to take such reasonable precautions as would prevent the goods being injured by the delay.

On behalf of the ship-owners it is contended that their rights and duties are to be determined by the law of Holland, and, for the purpose of proving the law of that country, it has been agreed that certain sections of a printed publication called the "Commercial Code of the Netherlands" shall be taken as proof of the law, which is as follows:

"Sec. 478. When, during the voyage, the master is compelled to have the ship repaired, the freighter or shipper must await the completion of the repairs; or, if he prefers it, unload the cargo, and take charge thereof, against payment of the full freight and the general average due, and subject to the stipulations contained in the five hundred and eleventh article. No freight is due by him during the repairs, if the ship is chartered by the month, nor any augmentation of freight, if she has been freighted by the voyage. If the ship cannot be repaired, the master is bound to hire another vessel, or other vessels, for his account, to convey the cargo to the place of destination, without being entitled to claim any augmentation of freight. If he has not been able to procure any other vessel at the place, or neighboring places, the freight is only due to him in proportion to the part of the voyage already performed. In this latter case, the care of transporting the cargo further devolves on the shippers, respectively, without prejudice to the obligation of the master, not only to acquaint them with the state of things, but also to take in the mean time the requisite measures for the preservation of the cargo. All, unless otherwise agreed upon by the parties."

It is claimed on behalf of the ship that under this provision of the Netherlands Commercial Code her owners had a right to retain the cargo until the ship was repaired, in order to earn the freight. The libelants contend that, as the port of Baltimore was the place of the performance of the contract of carriage, the American law is to be applied, and that by it the duty of the ship-owner was to send the goods forward if he could not repair his own vessel in a reasonable time, provided another vessel could be had in Amsterdam, or any contiguous port; in which event he would be entitled to charge the goods with any increased freight. *The Maggie Hammond*, 9 Wall. 458.

With respect to the shipment of beans, I think facts are proven which affect the liability of the ship quite independently of either the law of the United States or of the Netherlands with regard to the duty of transhipment. The beans were perishable, and were also an article of merchandise which depended for value very much upon their arriving at their destination within the season of the year when there is demand for them. Being perishable, by every maritime code it

was the duty of the ship-owner or master to take proper and reasonable precautions for their preservation; and, being an article dependent for value upon seasons of the year, it was their especial duty not to mislead the shipper with regard to their probable arrival at their destination. I think that facts about which there is no controversy show that in both these respects the ship-owners failed in their duty, to the detriment of the owner of the beans.

The master of the Jason states in his testimony that when the steam-ship arrived back at Amsterdam, and a full survey was made, it was then ascertained and known to the owners how long the repairs would take. About this time the ship-owners wrote a letter, dated December 10, 1883, to the shipper of the beans, at Buda-Pesth, notifying him that the Jason had been disabled at sea, and had returned to port for repairs, and informing him that the repairs would delay the steamer at Amsterdam until January, and that probably the voyage would be resumed about the middle of January. The answer of the shipper was dated December 12th, in which he complains of the hardship of having the beans remain in Amsterdam three or four weeks longer, calls attention to the fact that the beans might be out of season on arrival at their destination, and claims that they ought to be at once transhipped, and sent forward by another vessel. The reply of the ship-owners on December 18th states that they would be glad to discharge the beans, and forward them, but that they were so stowed, in the lowest part of the ship, that they could not be taken out without discharging almost all of the cargo. In making this statement with regard to the location of the beans the writer of the letter appears to have been mistaken. The testimony of the stevedore, taken by the ship-owners in Amsterdam, and also the testimony of the master, shows that the beans were stowed in the forward part of the after between-decks, where it could not have been difficult to get at them.

It appears, therefore, that there was misleading information given, both with regard to the length of time the vessel would be detained at Amsterdam, and with regard to the difficulty of relanding the beans. If the owner of the beans had received correct information, he could have insisted upon having his goods by tendering payment of whatever sum by law he was chargeable with, and could either have sold them in Holland, or have had them forwarded to Baltimore, as he thought best. It is not reasonable to suppose that he would have allowed the beans to have remained for three months stowed in the ship, subject to the great risk of decay, and with the certainty that the season for the sale of them would be nearly over when they finally reached their destination. Then, looking to the duty resting upon the ship-owners to take proper care for the preservation of the cargo of which they retained possession, it was not proper care of a perishable article to keep it for such a length of time confined in an iron ship. It could hardly escape the very result which did happen,

namely, that the want of ventilation and the dampness of the hold during so long a time set up a fermentation which was very injurious. It was a misleading notification to inform the shipper that the vessel would probably resume her voyage about the middle of January, when in fact the owners had reason to know that she could not get away for a much longer period. This erroneous notification naturally prevented the owner from attempting to preserve the beans from the decay which was going on from month to month, and also from attempting to forward the beans during the selling season.

I hold, therefore, that the ship-owners are liable for the injury to the beans, under the general maritime law governing the duty of masters and ship-owners in respect to the care and protection of perishable cargo while in their possession, and that nothing to the contrary appears in those rules of the Commercial Code of Holland which have been proved.

It is suggested that the libelant must fail because there is no evidence to show that the beans were sound when shipped, they being then packed in bags, and not examined, and being described in the bill of lading simply as in *apparent* good order. But the bill of lading itself makes a *prima facie* case, and there has been no testimony offered on behalf of the ship-owners sufficient to shift the burden of proof. Indeed, all the evidence offered on their behalf goes to establish the existence of those very conditions which would cause the injury to the beans which they exhibited when they arrived. No explanation is offered of the circumstance that they had been rebagged in American bags, and the inference is very strong that the old bags had rotted off, and the beans had been shoveled up and rebagged after arrival at Baltimore. The dirt and other substances found mixed with them confirm the witnesses who testified to their belief that this had happened.

| | | |
|---|---:|---:|
| The beans had been sold, to arrive, for | | $1,564 55 |
| The damaged beans sold for | $981 67 | |
| Less the expenses of storage and handling and rebagging, | 63 96 | 917 71 |
| | | |
| Amount of loss, | | $646 84 |

Interest for two years to be added.

With regard to the iron rods, the case is in essential respects different. The iron was not perishable, and was a shipment of great bulk and weight, which was to be carried at the very low freight of six shillings per ton, being only about $500 for the whole 10,347 bundles, weighing over 321 tons. It does not appear whether or not notice of any kind was attempted to be given by the agents of the vessel to the owners of the iron. The bill of lading states the iron to have been received from the agents of the vessel, and to be deliverable to order. The Oliver & Roberts Wire Company paid for it in Pittsburgh by paying a draft attached to the bill of lading. The manager of that corporation states that the only information he ever

received with regard to the delay was from seeing an item in the newspapers reporting that the Jason had been disabled at sea, and had put back to Amsterdam.

It would seem that ordinary rules of commercial dealing would require some notice to be given when goods, under a contract of immediate shipment, are detained in the port of departure such a length of time; but, conceding this to be so, the neglect to give such a notice cannot entail liability for damage other than is shown to have actually resulted from the neglect. The evidence adduced on behalf of the ship-owners shows that the Jason was the only vessel employed by them between Amsterdam and Baltimore, and that, during the 104 days she was being repaired, there was no steamer sailed from Amsterdam to Baltimore, and that they could obtain no other steamer upon reasonable terms. It is testified that they made efforts to procure such a steamer, but could obtain none, either at Amsterdam or elsewhere, except by guarantying a much higher rate of freight upon a full cargo to Baltimore, and also on the return voyage back to the continent.

There is no testimony to controvert this, and the court must accept it as the fact. If, then, there was no opportunity of transhipping the iron from Amsterdam, what could the owner have done if he had been notified of the actual state of affairs? I have held with respect to the beans, which were perishable, that if the owner had not been misled as to the possibility of discharging his perishable goods, and also as to the probable duration of the detention, it must be presumed that, as a prudent owner, he would have reclaimed them, and sent them by some conveyance to Baltimore from Rotterdam, Antwerp, or elsewhere, or that he would have them sold in some other market, or, at any rate, he would have stored them in some suitable place, because, to keep them stowed three months in an iron ship was to risk their destruction, and to lose the season; but this is by no means true with respect to a heavy imperishable article, such as steel-wire rods, intended to be used only for manufacture. There is no evidence to prove, and no inference fairly to be made, that the owners of the iron would have acted differently if they had known all the facts as they existed. Even if they could have obtained the iron from the Jason without payment of any freight, they would have been at the expense of discharging it, and at the expense of transporting it to some other port, putting it aboard another vessel, and paying freight on it to the United States. With regard to the rusting of the iron, if the owner had thought that to keep it under hatches, on board the ship, was not the best place for it, he would have had to consider whether the probability of some increase of expense in removing the rust was not to be preferred to the expense of unloading and reloading, and the expense of storing it in some drier place, if, indeed, protected storage for such a weight of iron could have been found convenient to the ship. There is no proof that any of these things could

have been done, or, if possible, would have been done, by the owner of the iron, if present in Amsterdam.

If it was not possible to have transhipped and forwarded the iron by any other conveyance, at a reasonable cost; and if, considering the value of the iron, and its imperishable character, and the expense of handling it, a prudent owner would not have stored it,—then it is difficult to see how the owner's position was made worse by not having had notice. In the absence of other evidence, the reasonable presumption and inference is that a prudent owner would have taken the chances of allowing the iron to remain on the vessel, and would have suffered the possible additional rust and the delay, so that, in the end, he might, without additional expense, obtain the advantage of the very low freight which the owners of the Jason had agreed to take. The delay not having been the fault of the ship-owners, and the care of the iron having been, under the circumstances, reasonable and proper, and the want of notice not having been shown to have prejudiced the owners of the iron, their libel must be dismissed.